**TRAWLER JEANNE D'ARC, INC., as owner of F/V JOHN J. NAGLE, Libellant,**

v.

**CASCO TRAWLERS, INC., as owner of F/V DORCHESTER, Respondent.**

**TRAWLER JEANNE D'ARC, INC., as owner of the F/V JOHN J. NAGLE, Libellant,**

v.

**SAMPLE & SON, INC., Respondent.**

Nos. 239, 240.

United States District Court
D. Maine, S. D.
Sept. 30, 1966.

Paul A. Wescott, Portland, Me., Leo Glynn, Richard A. Dempsey, Boston, Mass., for libellant in both actions.

Harrison L. Richardson, Jr., Edward T. Richardson, Jr., Portland, Me., for respondent Casco Trawlers, Inc.

Nathan Thompson, Benjamin Thompson, Charlton Smith, Portland, Me., for respondent Sample & Son, Inc.

## OPINION AND ORDER
## OF THE COURT

GIGNOUX, District Judge.

On the morning of November 30, 1963, the F/V JOHN J. NAGLE, the Schooner ADVENTURE and the F/V DORCHESTER were moored at the outfitting pier of the boat yard of respondent Sample & Son, Inc., located at Mill Cove, Boothbay Harbor, Maine. During a violent windstorm, the ADVENTURE and the DORCHESTER broke adrift from their moorings shortly after 10:00 a. m., finally coming to rest on the flats at the head of the cove, and the NAGLE sank at her berth. Libellant, the owner of the NAGLE, has brought these two libels in admiralty for damages resulting from the sinking of its vessel against respondent Casco Trawlers, Inc., as owner of the DORCHESTER, and against respondent Sample & Son, Inc., as bailee of the ADVENTURE and the NAGLE, charging each with negligence causing the sinking of its vessel. Libellant's claim is that the sinking of the NAGLE occurred when the ADVENTURE, which was moored at the head of the pier, broke loose from her moorings and drifted down on the DORCHESTER, severing the lines with which the DORCHESTER was moored and causing the DORCHESTER to break loose and to be blown down on the NAGLE, striking the NAGLE's transom and sinking her. Libellant contends that the sinking was the fault of Sample because the ADVENTURE and the NAGLE were not moored in a seamanlike manner in view of the weather conditions which had been forecast. It also claims that the sinking was the fault of Casco Trawlers because the DORCHESTER was improperly secured and inadequately manned, and her captain had failed to take adequate precautions for her safety in light of the storm warnings he had received. Both respondents deny negli-

gence, and assert that the accident was caused by "inevitable accident," or *vis major*, without fault on their part. Sample also denies that the ADVENTURE drifted down on the DORCHESTER or the NAGLE, and Casco Trawlers denies that the DORCHESTER struck the NAGLE.

The two actions have come to trial as a consolidated case. By agreement of the parties, the Court has heard the evidence and considered the written and oral arguments of counsel, on the issues of liability, and now makes its findings of fact and conclusions of law, and directs entry of its judgment, as follows:

### FINDINGS OF FACT

#### Mill Cove and the Sample Pier

The Sample pier is situated on the easterly shore of Mill Cove, a sheltered inlet at the extreme northerly limit of Boothbay Harbor, approximately five miles due north of The Cockolds Light Station off the coast of Southern Maine. Mill Cove is one of the safest harbors on the Maine coast, and is known as a "storm haven." The only direction from which wind and sea constitute a hazard to vessels moored within the cove is due south.[1]

The Sample pier is wooden and T-shaped. The main pier, to which the vessels involved in this action were moored, is 425 feet long and lies on a north-south axis. The pier's deck is five feet above mean high water and 13 feet above mean low water. Fender piles approximately one foot in diameter extend to a height of eight to ten feet above the pier. At mean low water there is between 15 and 20 feet of water at the southerly, or seaward, end of the pier, and approximately eight feet of water at the northerly, or inshore, end.

#### The Storm of November 30, 1963

On November 30, 1963, a storm of unprecedented violence struck the coast of Southern Maine. At 8:00 a. m. the U. S. Coast Guard Cuckolds Light Station officially reported Force 11, or whole gale winds from the south at 64–72 miles per hour, and 30 foot seas. At 12:00 p. m. it reported Force 12, or hurricane winds from the south at 73 or more miles per hour, and 35 foot seas.[2] According to John W. Hambleton, a professional meteorologist called by Sample, the storm was a true tropical hurricane from either the Gulf of Mexico or the South Atlantic Ocean, accompanied by unusually low barometric pressure readings and unusually high temperatures, indicative of the storm's character and intensity.[3]

---

1. Peter R. Woodbury, a professional meteorologist called by libellant, testified that the only dangerous wind sector in Mill Cove was due south. John W. Hambleton, a professional meteorologist called by Sample, testified that the Sample pier in Mill Cove would be exposed to the weather only within the compass sector 170°–190° true. The lay witnesses for all three parties concurred.

2. According to the U. S. Department of Commerce, Weather Bureau, Beaufort Scale of Wind Force, Force 11 winds of 64–72 miles per hour (56–63 knots) constitute a "whole gale"; Force 12 winds of 73 or more miles per hour (64 or more knots) constitute a "hurricane." Both are characterized as "very rarely experienced; accompanied by widespread damage."

3. The Cuckolds Light Station recorded a barometric pressure of 28.93 at 8:00 a.m. and of 28.80 at 12:00 p.m. The wind ve-

locities officially recorded at various other U. S. Weather Stations in Southwestern Maine confirm the readings at The Cuckolds Light Station. At the U. S. Coast Guard Halfway Rock Light Station, located in Casco Bay, approximately 18 miles west-southwest of The Cuckolds, southeasterly winds of 39–46 miles per hour were reported at 8:00 a.m., and southeasterly winds of 55–63 miles per hour were reported at 12:00 p.m. The U. S. Naval Air Station at Brunswick, approximately 14 miles northwest of Boothbay Harbor, recorded 20 knot southerly winds, with peak gusts of 34 knots, at 8:00 a.m.; southerly winds of 33 knots, with peak gusts of 54 knots, at 10:00 a.m.; and 36 knot southerly winds, with peak gusts to 50 knots, at 12:00 p.m. The official records of the U. S. Weather Bureau Station at Portland, approximately 32 miles west-southwest of Boothbay Harbor, show 23 knot southerly winds, with gusts to 41 knots, at 8:00 a.m.;

While there is no official record of the precise wind velocities at Boothbay Harbor during the morning of November 30, Peter R. Woodbury, a professional meteorologist called by libellant, testified without contradiction that the contours of the land masses at the approaches to Boothbay Harbor would have the effect of constricting a southerly wind field toward the head of the harbor, thereby increasing the outside wind velocity by 10 to 20 knots. Based upon the wind velocities recorded at The Cuckolds on the morning of November 30, Woodbury's computations indicate the force of the wind in Mill Cove was at least 85–95 miles per hour at the height of the storm.

The severity of the storm at Boothbay Harbor is confirmed by a number of witnesses who were present at the Sample yard that morning. Mason C. Carter, an experienced local marine contractor, who testified for libellant, estimated the wind at Mill Cove was southerly at 40 knots at 7:00 a. m., and increased to 50 to 60 knots by 9:00 a. m., with peak gusts up to 100 miles per hour out in the harbor shortly thereafter. Sample's president, Frank L. Sample, Jr., estimated that at approximately 10:00 a. m. the sustained wind force reached a peak of about 75 miles per hour with gusts up to 90 miles per hour. Various witnesses also testified to extensive storm damage. In addition to causing the ADVENTURE and the DORCHESTER to break adrift, the storm washed away the access pier leading to the "T" area of Sample's wharf, taking with it four cradled boats and a 70′ x 24′ wooden machine shop on the wharf; did extensive damage elsewhere in the Sample yard; blew down a cottage on a nearby island; blew down chimneys; demolished a porch; blew down trees; and washed ashore a number of smaller boats moored in Mill Cove.[4]

The tide, which was at one of the highest levels of the year, was officially reported at 10.9 feet above mean low water at Portland at approximately 10:00 a. m. According to Carter's testimony, the strong southerly wind and sea would have had the effect of raising the water level one to two feet above normal at Boothbay Harbor, indicating a tide almost level with the deck of the Sample wharf.

That the storm was unprecedented is shown by the meteorological records and the testimony of all the witnesses who were present in Mill Cove that morning. Official records show that the highest wind gusts recorded at the U. S. Weather Bureau Station at Portland during the previous 12 years were 78 miles per hour on August 31, 1954; 74 miles per hour on September 11, 1954; and 76 miles per hour on June 19, 1957, December 26, 1957 and September 12, 1960. Carter, Sample and other local residents testified that they had never seen anything like it before in Mill Cove. Although Carter and Sample had experienced several previous hurricanes, they stated that there had never before been any damage to the Sample pier or to any boats moored in the cove. All the evidence confirms that the violent impact of the storm in Mill Cove was caused by the unusually high wind velocity, coupled with the exceptionally high seas and tide, and the fact that the wind held directly from the south for an unprecedented length of time.

*The Weather Forecasts During the Evening of November 29 and the Morning of November 30*

The official United States Weather Bureau forecasts, both marine and inland, issued during the evening of November 29 and the early morning of November 30 gave no warning of the severity of the storm. The official Eastport to Block Island marine weather forecasts issued by the United States

---

south-southwesterly winds of 31 knots, with gusts to 58 knots, at 10:00 a.m.; and 30 knot southerly winds, with gusts to 46 knots, at 12:00 p.m.

4. The parties have stipulated that Boothbay Harbor was officially declared an S.B.A. disaster area following the storm.

Weather Bureau at Boston at 11:00 a. m., 5:00 p. m. and 11:00 p. m. on November 29 and at 5:00 a. m. on November 30 [5] were as follows:

*November 29, 1963—11:00 a. m.*

Gale warnings displayed Eastport to Block Island. Easterly winds increasing to 40 to 45 knots occasionally higher in gusts shifting to northwest during early morning hours. Rain occasionally heavy this afternoon ending Massachusetts and Rhode Island coastal waters late at night. Tides one to two feet above normal with some minor flooding at time of high tide. Visibility lowering to one mile or less in rain and fog improving to over six miles during Saturday. Partly cloudy Saturday except * * * snow flurries along Maine coast.

*November 29, 1963—5:00 p. m.*

Gale warnings displayed. East to southeast winds increasing to 40 to 45 knots occasionally higher in gusts early tonight shifting to northwest during the early morning hours of Saturday. Tides one to two feet above normal with some minor flooding in low lying coastal points at time of high tide. Northwest winds 30 to 40 knots and higher in gusts on Saturday. Visibility one mile or less in rain and fog improving to over six miles on Saturday. Rain tonight ending by morning, considerable cloudiness on Saturday.

*November 29, 1963—11:00 p. m.*

Gale warnings displayed Eastport to Block Island, southerly winds 30 to 40 knots shifting to northwesterly Saturday morning probably gusting to about 50 knots. Rain ending Saturday morning then becoming partially cloudy with visibility improving to over six miles.

*November 30, 1963—5:00 a. m.*

Gale warnings displayed from Eastport to Block Island, southerly winds 30 to 40 knots and gusty today shifting to west and northwest 30 to 40 knots and gusty along the Rhode Island, Massachusetts and New Hampshire coast this morning and along the Maine coast this afternoon. West to northwest winds 25 to 40 knots with higher gusts tonight and Sunday. Scattered showers changing to snow flurries with the wind shifting today and ending south portion during the afternoon. Partly cloudy tonight and Sunday with scattered snow flurries well off shore. Visibility 1 to 3 miles in the showers and patchy fog and locally near or below a mile in the flurries. Tides 1 to 2 feet above normal with some minor flooding at time of high tide this morning. Rough seas.

The November 29th Zone A inland weather forecast, which includes the Boothbay Harbor area, predicted "northwesterly winds 15 to 25 miles an hour and higher gusts" for the following day. The November 30th Zone A forecast predicted "gusty westerly winds 30–40 m. p. h." for that morning.[6]

The record is clear that no hurricane, or even whole gale, warning was issued. In addition, both Carter and Sample testified, without contradiction, that when they arrived at the Sample pier on the morning of November 30, only the small craft warning flag was flying at the U. S. Weather Bureau Coastal Warning Station in Boothbay Harbor. In sum, all

---

5. Philip H. Lord, the meteorologist in charge of the United States Weather Bureau at Portland, testified that the United States Weather Bureau at Boston issues the official marine forecasts for the Eastport to Block Island area, and that the Portland Weather Bureau relays these forecasts to various radio stations and other news media in the State of Maine. Additionally, the Boston Weather Bureau issues its forecasts to the national news services, which distribute them to their subscribers in Maine and elsewhere in New England. The official forecasts are issued four times daily, at 5:00 a.m., 11:00 a.m., 5:00 p.m. and 11:00 p.m.

6. None of the professional meteorologists or lay witnesses who testified at the trial could say whether the marine or Zone A inland forecast was applicable to the Mill Cove section of Boothbay Harbor.

the witnesses who testified at the trial, both lay and expert, agreed that the official weather forecasts during the evening of November 29 and the early morning of November 30 gave no hint that southerly winds of hurricane or near-hurricane force were to be anticipated.

### The Vessels at the Sample Pier on the Evening of November 29

On November 29, 1963, the ADVENTURE was moored at the southerly end of the Sample pier, her bow facing south toward the open sea and overhanging the end of the pier by 10 to 15 feet. The ADVENTURE was an old low-sided wooden schooner used for carrying summer tourists. She was 121 feet long, with a spoon bow and an overhanging stern. The ADVENTURE was in the Sample yard for winter storage, and had been moored some two months previously by Captain Ben Lewis, Sample's foreman, an experienced boatman and the holder of an unlimited master's license. She was secured to the pier by two forward breast lines running from her bow around the southerly end of the pier to pilings on the opposite side; a spring line leading from her bow aft to the pier; a spring line leading from her stern forward to the pier; and two stern breast lines running from her stern to the pier. All of the lines were single manila lines two inches in diameter with ample scope and equipped with canvas chafing gear. On the outboard side of the ADVENTURE were two rock moorings, each weighing approximately three tons and secured by double manila lines approxi-mately 100 feet in length and 50 feet of chain. A forward mooring was 30°–45° off the starboard bow, and an aft mooring was off the starboard quarter. During the two months the ADVENTURE had been moored at the dock, her lines had been checked daily.

The 100-foot wooden trawler CASCO BAY was moored some 30 to 35 feet to the north of the ADVENTURE, her bow also pointing south toward the sea. The CASCO BAY, which was owned by Captain Thomas F. Jordan, the captain of the DORCHESTER, was secured to the dock by a single bow breast line, two spring lines, and one or two stern breast lines.[7]

The 107-foot wooden trawler NAGLE was moored at the northerly end of the pier, her bow pointing north toward the head of the cove and flush with the end of the pier. Her stern was approximately 75 to 80 feet north of the CASCO BAY.[8] The NAGLE had been delivered to the Sample yard for the removal of dry rot and other repairs two or three weeks previously by Captain Frank Ross, libellant's port captain and an experienced seaman. At the end of the work day on November 29, some two feet of decking at the stern of the vessel, her covering board, her landing piece and her stern log had been removed. The work had reached the point where all of the rotten wood to be taken out of the stern had been removed but had not been replaced by the new material.[9] The transom itself, as a separate member, re-

---

7. The CASCO BAY did not break away during the storm.

8. It is impossible to reconcile the widely differing estimates given by the various witnesses of the distances between the vessels moored at the Sample wharf. There appears, however, to be general agreement that the CASCO BAY was some 30 to 35 feet north of the ADVENTURE. Since the pier was 425 feet long, and approximately 315 feet of the pier was occupied by the ADVENTURE, the CASCO BAY and the NAGLE, the NAGLE must have been about 75 to 80 feet north of the CASCO BAY.

9. The landing piece was a solid timber approximately 6 x 8 inches which extended horizontally across the top of the inboard side of the transom. The covering board was a member some 2¾ inches square, on top of the landing piece, which also ran horizontally across the vessel just inside the top of the transom. The stern log was a continuation of the vessel's rail, attached to the top of the transom. The decking removed was some 2½ inches in thickness and ran from the top of the transom forward approximately two feet. All of these members in their normal position provided bracing for the transom.

mained intact.[10] The partially open stern was battened with canvas over the deck for protection against the sea and the weather.

The NAGLE was moored with its bow toward the head of the cove, both for ready access to the dock crane which was working her stern, and because of insufficient water at the northerly end of the pier at low tide to accommodate the 10 to 12 foot draft of the vessel's stern.[11] Captain Ross had originally left her in this position; she had been turned several times during the course of the repair work, so that the crane could reach the portion of the vessel being worked at the time.

The DORCHESTER, a 112-foot, 110-ton, steel hulled "otter" trawler, with a straight bow and an elliptical stern, and horizontal quarter rail, departed from Portland at approximately 2:00 p. m. destined for Nova Scotia. At 5:20 p. m., Captain Jordan received a weather broadcast over Station WOU in Boston, forecasting, as he recalls, winds "30 miles an hour or better" with a "roughly southeast" direction. In order to avoid head winds and seas on his trip to Nova Scotia, Captain Jordan reversed his course to Boothbay Harbor, intending to lie over in Mill Cove until the wind came around to the northwest. The DORCHESTER entered Mill Cove at approximately 6:00 p. m. after the Sample yard had closed for the day. Captain Jordan moored the DORCHESTER outboard the CASCO BAY, with her stern facing south toward the sea and approximately even with the bow of the CASCO

BAY. The DORCHESTER's bow overhung the CASCO BAY's stern by some 15 to 20 feet and was approximately 60 feet from the stern of the NAGLE.[12] Captain Jordan and his five-man crew secured the DORCHESTER with three lines leading to the CASCO BAY: one stern breast line running to the bow of the CASCO BAY; one bow breast line running to the stern of the CASCO BAY; and a single light spring line running from the stern of the DORCHESTER to the CASCO BAY.[13] The two breast lines were four to five inches in diameter; the spring line was one to two inches in diameter. All three lines were polypropelene. None of the lines were protected by chafing gear, although at least the stern line ran over the rails of both vessels.

Captain Jordan and his crew saw no sign of life at the Sample yard when they arrived. It was dark, and the gate to the yard was locked. They did not look for or see Sample's night watchman, nor did Captain Jordan notify Sample of his arrival.[14] After Captain Jordan and his crew completed mooring the DORCHESTER, he and all the crew except the engineer, Thomas Martin, Jr., left the Sample yard and returned by automobile to their homes in the Portland area. Captain Jordan did not provide Martin with any specific instructions as to what he was to do in case of an emergency. Apparently Martin was left aboard for the sole purpose of running the auxiliary generator, in order to keep the batteries up and prevent the engine room from freezing.

10. The NAGLE's transom was a single solid piece of timber, which extended from her deck to the bottom of the vessel several feet below the water line.

11. The testimony was that the NAGLE's bow drew 6 to 8 feet of water; her stern 10 to 12 feet of water. As previously indicated there was eight feet of water off the northerly end of the Sample pier at mean low tide.

12. See note 8, supra.

13. Captain Jordan's testimony that he believed eight or nine lines were put out by his crew on the evening of November 29

is without support in the record. He himself could recollect only three lines; Carter, Sample and McDougall observed only three lines on the following morning; and the four crew members who testified could only recollect a total of five lines between them.

14. Sample employed a night watchman, who was on duty from 4:00 p.m. until midnight. There was no watchman between midnight and 4:00 a.m. There is no evidence in the record to indicate that the night watchman learned of the DORCHESTER's arrival at the yard during the evening of November 29.

Captain Jordan and the rest of the crew did not return to Boothbay Harbor until the afternoon of November 30, after Captain Jordan had been notified that the DORCHESTER was aground. So far as Captain Jordan could recollect, he listened to no weather broadcasts during the evening of November 29 or the morning of November 30. He spent the morning of November 30 with a friend watching the surf at the end of Cape Elizabeth. Although he observed that the wind was "south southwest" at "70 or 80 miles an hour," he testified that he was not concerned about the safety of the DORCHESTER, and that he made no effort to get to Boothbay Harbor, or to contact Martin or the Sample yard to determine what the conditions might be in Mill Cove.[15]

*The Early Morning of November 30*

Shortly after 7:00 a. m. on the morning of November 30, Sample received a call at his home from Carter, who had arrived at the Sample yard at about 7:00 a. m. Carter informed Sample that "they had one high tide coming and * * * might be in trouble * * * at the wharf." He estimated the wind as southerly at about 40 knots. Sample arrived at the wharf at approximately 7:30 a. m., and his superintendent, Richard W. McDougall, arrived about 15 minutes later.[16] Together, Carter, Sample and McDougall inspected the lines of the various vessels at the pier. Observing that the DORCHESTER had nested alongside the CASCO BAY during the night, they dragged a 2½ inch hawser from the crane building and secured it from the foremast of the CASCO BAY around a piling on the opposite side of the pier. They then went aboard the DORCHESTER, where they saw that the stern breast line was nearly chafed off. They doubled this line with the unchafed end of the same line, and also ran

a second light spring line, which they found in the DORCHESTER's cabin, to parallel the existing spring line running from the DORCHESTER's stern to the CASCO BAY. They could find no other spare lines on the DORCHESTER. While aboard the DORCHESTER, they looked for, but were unable to find, any member of her crew, nor did they hear the sound of any motor running.[17] All three agreed that when they left the DORCHESTER, she was adequately secured for the anticipated wind and weather.

After leaving the DORCHESTER, Carter, Sample and McDougall checked the ADVENTURE and the NAGLE. They agreed that both vessels were riding easily and adequately secured for the storm. Sample also went aboard the NAGLE and found that she was not shipping water. According to Sample, the lines which were taking the primary strain on the ADVENTURE were the two lines to the forward mooring and the aft spring line leading from the southerly end of the pier to the vessel's stern. There was no evidence of chafing, and no additional lines were rigged to either vessel.

Between 9:00 and 9:30 a. m., Sample and McDougall left the pier to check other sections of the yard. By this time the wind had picked up to 50 or 60 knots, the seas were six to eight feet high, and the entire wharf was "more or less under water." Carter went to his boat, the 42-foot towboat Hi-M, which was moored in the lee on the easterly side of the pier about opposite the NAGLE. Carter watched the other vessels, which were "pitching wildly," from his towboat. Shortly before 10:00 a. m., the access pier, the cradled boats on the pier, the machine shop wharf, and the machine shop washed out; and Carter saw the ADVENTURE and the DORCHESTER

15. Captain Jordan testified that he could drive from his home in Falmouth to Boothbay Harbor in less than an hour.

16. November 30, being a Saturday, was not a working day at the Sample yard.

17. Martin testified that at approximately this time he was reading in his cabin below decks, but that the noise of the generator made it impossible for him to hear what was happening on deck. Martin's credibility as a witness is discussed below.

"start to move." They appeared to Carter to move off from the pier "together." [18] It was at this time that Carter decided to leave. He started his boat's engines and proceeded around the northerly end of the pier and then southerly along the westerly side of the pier out of Mill Cove and into inner Boothbay Harbor. As Carter left Mill Cove, he observed that the ADVENTURE's bow had swung approximately 45 degrees off from the pier, and that her stern was in against the pier. He observed that the DORCHESTER's stern had also swung approximately 45 degrees off from the pier, and that her bow had swung in toward the pier.

### The Sinking of the NAGLE

There can be little doubt that the bow of the DORCHESTER delivered the mortal blow which buckled the stern of the NAGLE and caused her to sink. The evidence in this respect is overwhelming:

After the storm, the NAGLE had sunk at her berth, lying on her side, her stern 10 to 15 feet off the pier and all of her lines still secured.[19] The top of her transom had been pushed in, opening the seam between the bottom of the transom and her hull.[20] Subsequent inspection disclosed a vertical gouge on the upper part of the transom, extending from a point about three feet above the water line to a point close to the top of the transom.

All the expert witnesses agreed that the buckling of the NAGLE's stern could only have resulted from trauma delivered by another vessel, and could not have been caused by action of the wind or sea.

Jan Bijhouwer, an independent professional marine surveyor, who testified as an expert witness both for libellant and for Casco Trawlers, stated that in his opinion the blow could only have been delivered by the DORCHESTER's bow.

Bijhouwer had been retained by the owners of the NAGLE and the DORCHESTER to survey both vessels, and had inspected them on December 2 after the NAGLE had been raised and the DORCHESTER had been returned to the pier. In support of his opinion, Bijhouwer pointed out that the vertical gouge on the NAGLE's transom could only be matched with the physical configuration of the DORCHESTER's bow. He stated that because of the DORCHESTER's elliptical stern and horizontal quarter rail, the mark would have been horizontal if her stern had struck the NAGLE. He stated further that the stern of the DORCHESTER could not have struck the NAGLE, because the DORCHESTER was 112 feet long, and the distance between the DORCHESTER and the NAGLE was insufficient to permit the DORCHESTER's stern to swing down on the stern of the NAGLE. He ruled out the possibility that the ADVENTURE had struck the NAGLE, because the ADVENTURE's spoon bow and overhanging stern would have notched the top of the transom.

Carter, Sample and McDougall all concurred in Bijhouwer's view that the DORCHESTER struck the NAGLE, although Carter indicated that in his opinion it was the DORCHESTER's stern, and not her bow, which did so.[21]

Finally, the only apparent eye witnesses to observe the movement of the vessels in Mill Cove after Carter's departure on the morning of November 30th confirm Bijhouwer's opinion. Earl E. Carleton, a retired ship rigger for the Bath Iron Works, testified that he observed the storm from the kitchen window of his home, which was on the westerly shore of the cove approximately 150 yards from the Sample pier. He was watching the ADVENTURE and the DORCHESTER

---

18. Carter stated that he did not see any of the lines of the ADVENTURE or the DORCHESTER part.

19. The bottom was soft mud.

20. As previously indicated, the NAGLE's transom was a solid piece of timber.

21. Carter's estimate that the DORCHESTER's bow was 125 to 150 feet from the NAGLE's stern is obviously far from the mark. See note 8, supra.

as they broke away from the pier, and he saw the DORCHESTER swing in toward the NAGLE, although he didn't actually see the two vessels hit. Alden Jordan, an employee of a Boothbay Harbor restaurant, testified that he observed the storm from the second floor of his house, which was situated at the head of the cove approximately 200 yards north of the Sample pier. He stated that he saw the DORCHESTER swing into the NAGLE and "ride there for approximately 10 to 15 minutes up and down on the transom." [22]

The evidence which has been recited compels the conclusion that the bow of the DORCHESTER struck the blow which caused the NAGLE to sink, and the Court so finds.

### The Breaking Adrift of the ADVENTURE and the DORCHESTER

While the evidence is conflicting, the Court is satisfied that a preponderance of the evidence supports Sample's position that the ADVENTURE did not drift down on the DORCHESTER and sever her lines. The only disinterested eye witnesses so testified.

Carter's testimony was explicit. He stated that as he was leaving Mill Cove in the Hi-M at the height of the storm, the ADVENTURE's bow had swung approximately 45 degrees off from the pier, and her stern *"was in against the wharf."* At the same time, he observed that the DORCHESTER's stern had also swung approximately 45 degrees off from the pier. Unquestionably, Carter, of all the witnesses who testified, had the best opportunity to observe the positions of the two vessels during these crucial moments. His testimony is wholly inconsistent with the theory advanced by libellant and Casco Trawlers that not only the ADVENTURE's bow lines, but her

stern lines had parted, causing her stern to drop down between the CASCO BAY and the DORCHESTER, severing the latter's lines and causing her to break away.

Carleton and Jordan were equally positive. Carleton testified that he observed "this DORCHESTER break away first, the stern swinging to the westward toward my house, and approximately * * * 15 minutes later, I saw the ADVENTURE start to go." He stated that when the DORCHESTER broke adrift, the ADVENTURE "was secured at the end of the pier." He further testified that he at no time saw the ADVENTURE strike the DORCHESTER. Similarly, Jordan testified, "At first the (DORCHESTER's) stern broke away first and then swung around towards the west and went into the NAGLE and rode there for approximately 10 to 15 minutes up and down on the transom and then I observed the ADVENTURE break loose and then they both went down towards the west and straight down the cove north." [23] He also stated that he at no time saw the ADVENTURE strike the DORCHESTER and that the DORCHESTER was away from the dock "before the ADVENTURE even broke loose." It is true that Carleton's and Jordan's observations were from across the cove, and no doubt, as they both admitted, "at times" the visibility was affected by the spume being blown across the water at the height of the storm. Jordan also admitted that he had a substantially "end-on" view of the accident. Nevertheless, their observations were confirmed by Carter's, and the record discloses no basis for discrediting the testimony of any one of these three eye witnesses.

Concededly, the testimony of Martin, the only other alleged eye witness, was in direct conflict with that of Carter, Carleton and Jordan. Although Martin

---

22. Only Martin, who testified that he was aboard the DORCHESTER when she broke away, throws some doubt on Bijhouwer's opinion. Martin stated that he did not "think" the DORCHESTER hit the NAGLE, but he did concede that she

might have done so without his knowing it.

23. Jordan testified that the DORCHESTER went down the cove stern first; the ADVENTURE went down bow first.

did not appear as a witness at the trial, his deposition was received in evidence on behalf of Casco Trawlers. He stated in his deposition that he was below decks in the DORCHESTER's engine room on the morning of November 30 when he heard what he believed to be the ADVENTURE colliding with the DORCHESTER. He said he went on deck to see what was going on and saw the ADVENTURE "kind of wedged in between us (the DORCHESTER) and the CASCO BAY." He further stated that the ADVENTURE pounded and chafed on the DORCHESTER's stern lines for 15 minutes or so until the stern lines parted and the DORCHESTER's stern went adrift. But, the Court gives little, if any, weight to Martin's testimony. There is substantial doubt that Martin was even aboard the DORCHESTER on the morning of November 30. So far as the record discloses, no one saw him that morning, although Carter, Sample and McDougall were on the pier and aboard the DORCHESTER, and while on the DORCHESTER they were unable to find any member of the crew aboard.[24] Furthermore, the Court is far from satisfied by Casco Trawler's explanation of the reason why Martin was not available to testify as a witness at the trial, so that the Court could hear his testimony and observe his demeanor. Martin was an employee of Casco Trawlers. At the time of the trial he was at sea off Nova Scotia as captain of the DORCHESTER. Casco Trawler's counsel stated that when Martin's employer had contacted him by radio telephone shortly before the trial, he had said he was not coming in and "that he had another $1800 to go." The Court does not question the good faith of counsel and accepts counsel's assurance that

he did all that reasonably could have been done under the circumstances to obtain Martin's personal presence at the trial. But Martin was unquestionably a key witness, and in view of the critical character of his testimony, his inexcusable refusal to appear cannot but reflect adversely upon his reliability as a witness.[25] Finally, Martin's testimony itself casts doubt on his credibility. While he was positive that the ADVENTURE had drifted down on the DORCHESTER and severed her lines, he was vague on almost every other detail, and for some inexplicable reason he could not recall whether his own vessel, the DORCHESTER, had hit the NAGLE. It seems evident that his recollection of the crucial events on the morning of the sinking is colored by the fact that he was the member of the DORCHESTER's crew who was immediately responsible for her welfare at the time.

Bijhouwer was the only other witness who testified on this issue. He stated that in his opinion the ADVENTURE drifted down upon the DORCHESTER, severing her lines and causing her to break adrift. The principal basis of his opinion was the fact that when he surveyed the DORCHESTER on December 2, he found "sizeable chunks of wood," "a foot or so, and a couple of inches in size which by the nature of their surfaces looked to be planking or other structure of a wooden vessel"; he observed "substantial" damage to the planking on the ADVENTURE's starboard quarter; and the pieces of wood which he found on the deck of the DORCHESTER were painted the same color (although he could not recall the color) and appeared to be similar to the damaged planking on the ADVENTURE. His theory was that all the AD-

---

24. Martin's testimony that they could easily enough have come aboard without his knowledge because "with an auxiliary in the engine room they could lug the whole boat off and I would never know it," is hardly consistent with the testimony of Carter and Sample that they heard no engine running while they were there.

25. It is also significant that Casco Trawlers did not call as a witness its principal officer, John E. Willard, Jr., although Martin had testified in his deposition that after the DORCHESTER went adrift, he had called Willard on the radio telephone, and had told him that his vessel was adrift. Willard could at least have confirmed that Martin was aboard the DORCHESTER at this time.

VENTURE's pier lines had parted, and she had swung on an arc around her bow mooring, causing her stern to drop downwind a sufficient distance to bring it into contact with the DORCHESTER's stern lines.[26] On cross-examination, however, Bijhouwer admitted that if the ADVENTURE's stern lines had held, her bow would have swung off the pier, describing an arc around her stern in a northwesterly direction, until she fetched up on her bow mooring, and if her bow mooring had drifted before her stern lines parted, she might well have sailed up the cove bow first without striking the DORCHESTER.[27]

It is evident that the critical assumption underlying Bijhouwer's view is that when the ADVENTURE's bow lines parted, her stern lines also parted and her bow mooring held.[28] But there is no support in the record for this assumption, which is wholly inconsistent with the explicit testimony of Carter, Carleton and Jordan that when the ADVENTURE's bow came off the pier, her stern remained in against the wharf. Nor is the Court persuaded that the presence of pieces of wood on the DORCHESTER's deck which were "consistent" with the planking on the ADVENTURE's starboard quarter compels the conclusion which Bijhouwer draws. Bijhouwer did not have an opportunity to inspect the vessel until December 2, and in the two days which had elapsed since the sinking, the DORCHESTER had been hauled from the beach, her crew had been aboard, and

undoubtedly there had been substantial activity on her deck. Although Bijhouwer was retained by the owners of the DORCHESTER to survey her damage, he made no apparent effort to identify positively the pieces of wood found on her stern with the ADVENTURE's planking. Moreover, as Sample points out, the fact that the ADVENTURE's starboard quarter was damaged during the storm does not necessarily mean that the damage was caused by her pounding on the DORCHESTER's stern. The ADVENTURE's starboard quarter could have chafed on a piling as the vessel pivoted on her stern while her bow was swinging around to the northwest. It is also, as Sample suggests, unlikely that if the ADVENTURE had pounded down between the DORCHESTER and the CASCO BAY, there would not have been far more substantial damage to the hulls of all three vessels than that disclosed by this record.[29]

On the entire record, the Court finds that the ADVENTURE did not cause the DORCHESTER to break away from the pier.

### CONCLUSIONS OF LAW

*Liability of Casco Trawlers as Owner of the DORCHESTER*

▮▮▮▮▮ There is no substantial dispute between the parties as to the legal principles applicable to libellant's claim against Casco Trawlers as the owner of the DORCHESTER. When a collision is caused by a vessel drifting from her

---

26. Basing his calculation on the assumption that the ADVENTURE's bow mooring was 30 degrees off her starboard bow, Bijhouwer computed a 13 foot stern movement from the swing of the vessel, plus another 12 to 13 feet from the stretching of the wet manila line and the lifting of the chain. If the bow mooring were 45 degrees off the DORCHESTER's starboard bow, he estimated that the stern movement from the swing of the vessel would be approximately 30 feet, plus 12 to 13 feet for the stretching of the line and the lifting of the chain.

27. As set forth above, Jordan testified that the ADVENTURE went up the cove bow first. See note 23, supra. After

the storm, she was bow first on the flats at the head of the cove and had dragged both moorings with her.

28. Even if, as libellant suggests, the ADVENTURE's after spring line parted first, it is difficult to conceive how, if her stern lines held, her stern could have dropped down and *swung out* from the dock a sufficient distance to become wedged between the CASCO BAY and the DORCHESTER.

29. Significantly, Bijhouwer conceded that he had not examined the ADVENTURE's port quarter or the bow of the CASCO BAY to determine whether there was any damage to either.

moorings, there is a presumption of fault on her part, and "she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a *vis major*, which human skill and precaution, and a proper display of nautical skill could not have prevented." The Louisiana, 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85 (1866); Patapsco Scrap Corp. v. Maryland Shipbuilding & Drydock Co., 268 F.2d 817, 819 (4th Cir. 1959); Swenson v. The Argonaut, 204 F. 2d 636, 640 (3d Cir. 1953); The President Madison, 91 F.2d 835, 837 (9th Cir. 1937). It is well settled that the burden of proving inevitable accident is "heavily" upon the party asserting that defense: Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960); The Lackawanna, 210 F. 262, 264 (2d Cir. 1913); that a finding of inevitable accident is "not to be lightly arrived at," The Bayonne, 213 F. 216, 217 (2d Cir. 1914); Palmer v. City of New York, 43 F.Supp. 43 (S.D.N.Y.1942); and that the party asserting the defense must affirmatively establish that the accident "could not have been prevented by the use of that degree of reasonable care and attention which the situation demanded * * *." Swenson v. The Argonaut, supra, 204 F.2d at 640: The Rob, 122 F.2d 312, 313 (2d Cir. 1941). With particular reference to the defense of inevitable accident as the result of high winds, Griffin, The American Law of Collision § 241, at 544 (1949) states:

> When collision is due to the force of the wind in parting the lines of moored or anchored vessels or in causing them to drag, the defense is allowed only if it appears (a) that the force of the wind was not to have been anticipated; (b) that the vessel had been moored or anchored in such a way as to be prepared to withstand

any winds reasonably to have been expected; (c) that there was no negligence on the part of those in charge of her.

■ The facts plainly show that Casco Trawlers has entirely failed to make out a case of inevitable accident and to establish that the drifting of the DORCHESTER was without its fault.

The record is replete with affirmative evidence of the negligence of the DORCHESTER. Despite the weather forecast of 30 miles an hour or better southeasterly winds which had caused him to seek a haven in Mill Cove, Captain Jordan nested his vessel outboard of another vessel with her stern to the direction of greatest exposure, and secured her to the inboard vessel, "bow to stern," with inadequate lines unprotected by any chafing gear. He and his crew then abandoned her, leaving only one man aboard, so that the DORCHESTER could not be maneuvered to avoid damage to herself or to other nearby vessels if an emergency should arise.[30] Captain Jordan left no instructions with that man, nor did he notify anyone at the Sample yard that his vessel was there or where he could be contacted in case of need. Despite the uncertain weather, Captain Jordan was not sufficiently concerned about his vessel's welfare even to listen to any weather forecasts during the evening of November 29 and the morning of November 30. Instead, he and a friend spent the morning of November 30 watching the "show" at Cape Elizabeth, and despite the hurricane winds and seas he observed, he, quite inexplicably, made no effort to drive to Boothbay Harbor, with or without his crew, or even to contact Sample or Martin to determine what the conditions might be in Mill Cove.[31] In thus leaving the DORCHESTER unmanned, secured in a minimal manner

---

30. The testimony revealed that the DORCHESTER did not have engine room controls in the pilot house and required at least two men to operate her.

31. It is equally difficult to explain Martin's apparent lack of concern on the

morning of November 30. Although he testified that he put out one additional line, he admitted that he made no effort to contact Captain Jordan or to obtain help ashore. If he was aboard the vessel at all, he apparently spent most of the morning "reading in the engine room."

and nested outboard of another vessel with her stern to the sea and the wind, without advising anyone at the Sample yard of her presence, and without making any effort to insure her welfare during his absence, the master of the DORCHESTER acted not only in a manner which was negligent and unseamanlike, but in a manner which was highly irresponsible and reckless. Certainly, Captain Jordan's conduct was far short of meeting the minimum standard of care required of a prudent seaman.

The evidence is equally convincing that the negligence of Captain Jordan and his crew contributed causatively to the sinking of the NAGLE. In this respect, it is sufficient to observe that the evidence clearly shows that the breaking away of the DORCHESTER and her collision with the NAGLE could very probably have been avoided had Captain Jordan left her in a maneuverable condition, with at least two men aboard; had he left Martin with sufficient additional lines and with adequate instructions as to what he was to do and whom he was to contact in the event of an emergency; had he taken the minimal precaution of checking the weather forecasts while he was away; or had he at least contacted his vessel and taken steps for her protection, when he observed the violence of the storm which was developing on the morning of November 30. As both Carter and Ross testified, and even Martin admitted, had the DORCHESTER been properly manned and maneuverable during the early morning of November 30, she could in all probability have been either moored more securely or moved from Mill Cove prior to the height of the storm.[32] As the court observed in The Adventuress, 214 F. 834, 838–839 (D. Mass.1914):

> most collisions are unavoidable at the moment they occur; * * * the primary rule is that precautions must be seasonable; and if they are not so, and a collision ensues in consequence of the delay, it is no valid defense to say that nothing could be done at the moment to prevent the injury; * * * it is generally possible to trace the cause of the disaster to some negligent act, or some antecedent omission of duty on the part of one of the vessels.

For all the reasons which have been stated, the Court concludes that the sinking of the NAGLE was caused by the negligence of the DORCHESTER, and was not the result of inevitable accident.

### Liability of Sample as Bailee of the ADVENTURE

Since the ADVENTURE did not strike either the NAGLE or the DORCHESTER, it follows that the sinking of the NAGLE was not caused by any fault of Sample as bailee of the ADVENTURE, and the Court so holds. Moreover, the Court is satisfied, upon the entire record, that Sample has sustained its burden of showing that on the morning of November 30 the ADVENTURE was moored in a seamanlike manner and in such a way as to be prepared to withstand any wind and weather conditions reasonably to have been anticipated, and that her drifting was because of inevitable accident "which human skill and precaution, and a proper display of nautical skill could not have prevented."[33]

32. Martin's testimony indicates further that had the DORCHESTER been properly manned, she could have dropped her two bow anchors and started her engines, and thereby might have avoided coming down on the NAGLE even after her lines had parted.

33. The Louisiana, supra. As recited above, the ADVENTURE was in the Sample yard for winter storage and had been moored two months previous to November 30 by Sample's foreman, Captain Lewis, an experienced boatman. She was secured to the pier by two forward breast lines; two crossed spring lines and two stern breast lines. She was also moored by double manila lines leading to forward and aft moorings on her outboard side. All of these lines were of good size, were equipped with chafing gear, and had ample scope. Her lines were checked daily. When inspected by Carter, Sample and McDougall on the morning of November 30, there was no evidence of chafing, and the vessel was riding easily. Libellant

### Liability of Sample as Bailee of the NAGLE

The law of bailment is applicable in suits for damages to a vessel that has been left with another for the purposes of repair. Buntin v. Fletchas, 257 F.2d 512, 513 (5th Cir. 1958); International Mercantile Marine S.S. Co. v. W. & A. Fletcher Co., 296 F. 855 (2d Cir. 1924). The applicable principles were stated by the court in Buntin v. Fletchas, supra, 257 F.2d at 513–514, as follows:

> When a bailor sues a bailee for loss of the thing bailed, and charges the bailee with negligence, the question arises whether the bailor must affirmatively show negligence, or whether the bailee must affirmatively show due care. The bailor has the burden of proof because he has the affirmative of the case; however, when the bailor shows delivery to a bailee and the bailee's failure to return the thing bailed, he makes out a prima facie case of negligence against the bailee. This does not, however, shift the burden of proof from bailor to bailee. The burden of proof never shifts. When, however, the bailor has made out a prima facie case, "it then becomes the duty of the bailee to go forward with the evidence and explain his default by showing facts and circumstances sufficient in law to exonerate him from liability for injury". (Citations omitted.[34])

Applying these principles to the present case, the Court is of the view that libellant has failed to establish that any negligence of Sample caused the sinking of the NAGLE.

No question is presented as to the sufficiency of the NAGLE's lines, since she did not break adrift. Libellant's sole claim of negligence is that she should not have been moored with her stern to the sea because of the risk of damage to her weakened stern. But all of the evidence is that she was moored in this fashion because of insufficient water at the northerly end of the pier to accommodate the draft of her stern. While Ross and Bijhouwer testified that in their opinion it was "good practice to lay a boat head to the wind at any time," no witness has suggested that Sample in any way failed to exercise the care of a reasonably prudent seaman and shipyard operator.[35] Moreover, the witnesses agreed that it would not have been practicable to have attempted to move the NAGLE while Carter, Sample and McDougall were at the pier on the morning of November 30, even if at that time they could have anticipated the violence of the storm. The evidence also shows that Carter, Sample and McDougall did all that possibly could be done to secure the vessels at the Sample dock in the limited time available that morning.

On all the evidence, the Court is of the view that Sample displayed no lack of

---

has produced no witness or other evidence which casts the slightest doubt upon the qualifications as seamen of Carter, Sample and McDougall, or upon the soundness of their judgment that the ADVENTURE was adequately moored for any foreseeable weather conditions.

34. The court in Buntin v. Fletchas, supra, at 514, further points out that there is disagreement among the cases as to the extent of the bailee's duty to go forward with evidence explaining his default:

> One view is that the bailee need show only that the loss was caused by some act consistent with due care on his part, such as an act of God; then the bailor must affirmatively show negligence. Another is that the bailee must do some-

thing more than merely show that the loss was occasioned by something consistent with due care; he must show affirmatively acts which constitute due care, because the circumstances of the loss are generally peculiarly within his knowledge. (Citations and footnotes omitted.)

Under either view, Sample has satisfied its burden in this case.

35. Interestingly, Ross himself stated that he moored the NAGLE with her stern to the south when he delivered her to the Sample yard some two weeks before the storm. He also admitted that he had checked her several times since, without making any complaint about the manner in which she was secured to the dock.

good seamanship in the mooring of the NAGLE, and that the sinking of the NAGLE was not caused by any negligence of Sample as the vessel's bailee.

## DIRECTION FOR ENTRY OF JUDGMENT

In accordance with the foregoing findings of fact and conclusions of law, judgment will be entered for the libellant Trawler Jeanne d'Arc, Inc. against the respondent Casco Trawlers, Inc. in the amount of the damages resulting from the sinking of the F/V JOHN J. NAGLE. Judgment will be entered for the respondent Sample & Son, Inc. against the libellant Trawler Jeanne d'Arc, Inc.